UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| In re ) | | |
| ) | | |
| MCQUILLEN PLACE COMPANY, LLC, an ) | | Case No. 19-00507 |
| Iowa limited liability company, ) | | Chapter 7 |
| ) | | |
| Debtor. ) | | Hon. Thad J. Collins |
| ) | | |
| ) | | |

MOTION OF EQUITY SECURITY HOLDERS TO AMEND JUDGMENT

NOW COME Charles M. Thomson and James Gray (the "Equity Security Holders"), through their counsel, and as and for their "Motion of Equity Security Holders to Amend Judgment" (this "Motion") respectfully state as follows:

1. On December 9, 2019, following motions from First Security Bank & Trust Company ("First Security Bank") and the United States Trustee ("Trustee"), the filing of a variety of pleadings, and two telephonic hearings, this Court issued a "Memorandum and Order" (the "Order") converting this case to a case under Chapter 7 of Title 11 of the United States Code.

2. The Order, apparently relying on a variety of statements made by counsel in their pleadings, contains what the Equity Security Holders believe to be material misstatements of fact which, if left unchallenged, may (a) materially prejudice the Equity Security Holders in future litigation or proceedings, and/or (b) cause unnecessary confusion to parties in interest (including, but not limited to, the Equity Security Holders) in future litigation or proceedings.

3. Both Federal Rule of Bankruptcy Procedure 9023 and 9024 permit this Court to amend the Order as requested in this Motion.

1

4. The specific points (set forth in the sequence in which they arise in the Order) the Equity Security Holders request this Court to address include the following:

    a. The last name of the principal of the Debtor should be spelled "Thomson" rather than the "Thomsen" spelling used throughout the Order. (Order at 1, first paragraph, line 4, *et seq*. *See* Affidavit of Charles Thomson [the "Thomson Affidavit," attached as Exhibit A], at paragraph 1).

    b. The reason stated by First Security for initially not being interested in the McQuillen financing was First Security's lack of experience in administering financings involving significant state economic development assistance, rather than Thomson's experience. (Order at 3, first paragraph, lines 2 and 3. *See* Thomson Affidavit at paragraph 2).

    c. As a result of the mediation referenced in the second sentence of the second paragraph on page 3 of the Order, First Security offered to sell its loan under certain circumstances. First Security and the Debtor did not "reach… an agreement on a new payment plan for the first mortgage." (*See* Thomson Affidavit at paragraph 3).

    d. The last sentence of the second paragraph on page 4 of the Order reads, "First Security has notified Debtor of the structural damage to the property and its continued deterioration." Similarly, on page 14 of the Order, beginning with the third sentence, the Order reads, "This causes the property to further deteriorate and sustain damage. There are already missing windows and holes in the plywood causing the inside of the building to be exposed to the outside elements and animals. Another winter is beginning, and Debtor's continued failure to preserve the estate constitutes gross mismanagement under § 1112(b)(4)(B)."

    These statements, apparently based on statements in pleadings by counsel for First Security, are not factually correct. As stated in the Thomson Affidavit (paragraphs 4 through 8) and the Affidavit of Ryan Boehmer (attached hereto as Exhibit B, the "Boehmer Affidavit"), the following facts reflect the condition of the property:

        i. There is no open window, boarded-up window or other penetration allowing the interior of any of the apartments to be exposed to precipitation or the elements.

        ii. The apartment section of the building is water-tight, regularly inspected, and heated during the winter months.

        iii. Regular inspection of the apartment section of the building (including a thorough inspection by a pest-management professional) have revealed zero activity by rodents, vermin, insects or similar creatures. Consequently, no

        damage whatsoever from such creatures has been observed or credibly alleged.

    iv.    There has never been a credible allegation of any structural damage to the building from exposure to the elements or otherwise.

    v.    When construction ceased, some of the roof penetrations had not been finished. The state of these penetrations permitted a small amount of water to enter the apartment area of the property, which in turn caused some cosmetic damage. Although not necessary to protect the structure of the property, Debtor's management had the penetrations sealed anyway, largely to prevent the cosmetic damage from becoming an issue in the ongoing litigation.

    vii.    The "broken window" referenced by First Security is actually a missing plastic panel in a skylight over an open-air arcade. The missing panel is barely visible from ground level outside the perimeter of the building. Apart from use of a drone or similar device, the missing panel can only be readily viewed from across the Cedar River. Since the skylight in question is over an open-air arcade, all the panels in the skylight could be removed without imperiling the structural integrity of the property. The entire area beneath the skylight is conditioned as an exterior space, able to withstand the extremes of Iowa's climate.

    viii.    The missing skylight panel had been blown loose once before in a thunderstorm. It was subsequently recovered and put back into place. The second time it was blown loose, it went missing. The cost of replacement is estimated at under $100. Since (x) the missing panel is strictly a cosmetic issue, and a largely minor one at that, and (y) an inspection of the metal surrounding that panel should be conducted by a qualified professional prior to replacement of the panel to determine why that panel, of all the panels in the skylight, has had issues, Debtor's management had not made replacement of the panel a priority.

    ix.    The building is locked, and electronic surveillance security is in place. To protect the asset, Debtor's management restricted the number and frequency of visitors to the site; personnel from the Debtor accompanied virtually all visitors to the site since construction ceased in 2017. No one from Debtor's management is aware of Mr. Larry Eide (First Security's counsel) ever being inside the building. The Equity Security Holders accordingly challenge whether any statement by Mr. Eide on the condition of the interior of the building could have been made from personal knowledge.

e.    In describing the 341 meeting in this case, the second sentence of the second paragraph on page 5 of the Order states, "Thomsen [sic] insisted a third-party financer was interested, and the money would be secured in a two-week time

3

frame." As set forth in the Thomson Affidavit at paragraph 9, this statement, apparently based on the recollection of counsel for the U.S. Trustee, is not factually correct. Thomson stated that he hoped to have confirmation of the financing within the two-week period, not that funds would be available.

f. The third sentence of the second paragraph on page 5 of the Order states, "Months passed and Debtor sought multiple extensions of the exclusivity period." This is not correct. The Debtor sought (and was granted) just one extension of the exclusivity period.

g. The third and fourth sentences of the second full paragraph on page 6 of the Order state, "Debtor also has a negative history of insurance payments on the project. First Security has had to advance installments on the insurance." The Equity Security Holders respectfully assert that these sentences do not reflect two facts which have been placed before the Court:

   i. During the pendency of the Chapter 11 case, the Debtor always paid the insurance premiums prior to any cancellation of the Debtor's coverage; and

   ii. As a consequence, any payments made by First Security were not necessary to prevent coverage from lapsing.

h. The second full sentence on page 7 of the Order states, "The affiliated business is owned by Thomsen [sic]." It appears from the context of this sentence that the referenced "affiliated business" is the dry-cleaning business known as "Classic Cleaners." This business is owned by the Debtor itself, not by the Debtor's principal. Similarly, the second sentence of the second paragraph on page 12 of the Order reads, "What little income Debtor receives comes from the dry-cleaning business that Debtor's principal owns." Again, this business is, in fact, owned by the Debtor itself.

i. The last names of the directors named in Adv. Pro. No. 19-09036 should be spelled "Herbrechtsmeyer" rather than the "Herbrechts-Meyer" spelling used in the Order. (*See* Order, first full paragraph on page 8, second sentence.)

NOW, WHEREFORE, the Equity Security Holders respectfully request that this Court enter an order amending the Order to:

   a. correct the spelling of the Debtor's principal's last name to "Thomson";

  b. reflect that First Security's original reason for declining involvement in the McQuillen financing was due to First Security's lack of experience in financings involving significant state economic development incentives;

  c. reflect that the result of the July 5, 2018 mediation was an offer by First Security to settle the litigation according to certain terms, rather than an agreement on a payment plan on the mortgage;

  d. reflect the fact that no structural deterioration occurred at the property between the cessation of construction and December 9, 2019, or, in the alternative, to eliminate entirely from the Order any discussion of the condition of the property;

  e. reflect that the principal of the Debtor indicated at the 341 meeting that he hoped to hear about securing funds within two weeks of the 341 meeting, rather than representing that he expected to secure funds within two weeks;

  f. reflect that the Debtor obtained a single extension of the exclusivity period;

  g. reflect that the Debtor maintained insurance coverage for the Debtor's assets throughout the pendency of the Debtor's chapter 11 case;

  h. reflect the fact that the Debtor owns the dry-cleaning business in question;

  i. correct the spelling of the last name of referenced directors to "Herbrechtsmeyer" from "Herbrechts-Meyer"; and

j. granting the Equity Security Holders such other and further relief as the Court deems just under the circumstances.

Respectfully submitted,

All of the Equity Security Holders of the Debtor

 /s/ Charles Thomson
Charles M. Thomson

Charles M. Thomson, Esq.*
Law Office of Charles M. Thomson
1110 N. Grand Ave., Suite 300
Charles City, Iowa 50616
847-495-6834 - office
847-495-3488 - fax
cthomson@doall.com
*Licensed in Iowa and Illinois

6

EXHIBIT A
AFFIDAVIT OF CHARLES M. THOMSON

The undersigned, Charles M. Thomson, an adult resident in Floyd County, Iowa, under the penalty of perjury, having personal knowledge of the facts set forth below, solemnly states as follows:

1. My last name is spelled "Thomson."

2. The reason stated by First Security for initially not being interested in the McQuillen financing was *First Security's* lack of experience in administering financings involving significant state economic development assistance. As stated in the Equitable Subordination Complaint (Adv. Pro. No. 19-09035) in paragraphs 26 through 29, this concern of First Security was later obviated by the agreement of Cedar Rapids Bank & Trust Company (which claimed to have this expertise) to act as "lead" lender.

3. The outcome of the July 5, 2018, mediation was an offer by First Security to sell its interest in the loan to McQuillen Place Company, LLC under certain circumstances. First Security and McQuillen Place Company, LLC did not "reach… an agreement on a new payment plan for the first mortgage."

4. There is no open window, boarded-up window or other penetration allowing the interior of any of the apartments to be exposed to precipitation or the elements. The apartment section of the building is water-tight, regularly inspected, and heated during the winter months.

5. In May 2019, I asked a professional exterminator to examine McQuillen Place for evidence of animals, vermin, etc. I personally walked him through the entire building. He found nothing to indicate the presence of any vermin, rodents, etc.

6. The "broken window" referenced by First Security is actually a missing plastic panel in a skylight over an open-air arcade. The missing panel is barely visible from ground level outside the perimeter of the building. Apart from use of a drone or similar device, the missing panel can only be readily viewed from across the Cedar River. Since the skylight in question is over an open-air arcade, all the panels in the skylight could be removed without imperiling the structural integrity of the property. The entire area beneath the skylight is conditioned as an exterior space, able to withstand the extremes of Iowa's climate.

7. The missing skylight panel had been blown loose once before in a thunderstorm. It was subsequently recovered and put back into place. The second time it was blown loose, it went missing. The cost of replacement is estimated at under $100.

8. The building is locked, and electronic surveillance security is in place. I do not recall ever seeing Larry Eide go through the building, although I have been on numerous walk-throughs with personnel from First Security.

7

9. At the 341 meeting for the Debtor, I tried to make it very plain that financing was not yet in place, but that I hoped to hear (and get something in writing) within two weeks of the 341 meeting. I have attempted to get a copy of the recording of the meeting to confirm this, but I have not yet obtained it. It is possible that I misspoke, but I specifically remember wanting to make clear that while the Debtor had received verbal promises of financing, the Debtor had not obtained a written financing commitment.

Further, affiant sayeth naught.

        /s/ Charles M. Thomson       

Charles M. Thomson

EXHIBIT B
AFFIDAVIT OF RYAN BOEHMER

The undersigned, Ryan Boehmer, an adult resident in Floyd County, Iowa, under the penalty of perjury, having personal knowledge of the facts set forth below, solemnly state as follows:

1. Since fall 2017, at the direction of Charles M. Thomson, I have regularly and frequently performed various tasks at McQuillen Place, 123 North Main, Charles City, Iowa 50616. Among these tasks have been inspecting the building thoroughly for any signs of deterioration or trouble, making sure the heaters were functioning during cold spells, showing people through the building, and similar tasks.

2. In the period I have been checking on the building, I have paid particular attention to the windows of the apartment areas of the building. I have made a point of going into the building after the heavy rains in the area to make sure the building is dry and that no storm damage has occurred.

3. None of the windows in the apartment section are broken or missing (although there is one interior pane of glass which was broken in 2016, but it does not result in air or rain being able to enter the building, since the exterior glass remains intact).

4. I've never seen any animals in the building or any evidence of animals in the building. There is no food in the building, so there is nothing to draw animals inside.

5. I have not detected any deterioration or change in the building which would suggest that the structure has been compromised in any way. I have not seen anything going on in the building which would, if permitted to continue unabated, result in structural damage.

6. I am experienced in construction and have worked for many years in various construction trades. I have assisted my father, a former fire fighter who is an authority on construction, safety codes and the Charles City Code, in various construction projects, including, but not limited to, building houses and small commercial structures.

7. The apartment section of the building is water-tight. The commercial section of the building has a sand floor (except for the perimeter), and is protected from deterioration by plywood affixed to the exterior. The plywood is weathering, but it is intended to do so. The plywood protects the materials and finished construction within the plywood perimeter from exposure to the elements and theft.

8. For a while after construction stopped, small amounts of water would drip into the building after a rainstorm. These drips (measurable in tablespoons and perhaps mason jars) causes some cosmetic damage by, for example, creating a water stain on a piece of drywall near the ceiling.

9. These roof penetrations were subsequently sealed, so now there is no water penetration.

10. There is a missing plastic panel in a skylight over the building's open-air arcade. The missing panel is barely visible from ground level outside the perimeter of the building. Apart from use of a drone or similar device, the missing panel can only be readily viewed from across the Cedar River. Since the skylight in question is over an open-air arcade, all the panels in the skylight could be removed without imperiling the structural integrity of the property. The entire area beneath the skylight is conditioned as an exterior space, able to withstand the extremes of Iowa's climate.

11. The missing skylight panel had been blown loose once before in a thunderstorm. It was subsequently recovered and put back into place. The second time it was blown loose, it went missing.

12. The building is locked. The number and frequency of visitors to the site is restricted. Generally, no one is permitted in the building without someone from the Debtor accompanying them. I don't remember anyone named "Larry Eide" ever coming into the building.

Further, affiant sayeth naught.

/s/ Ryan Boehmer
Ryan Boehmer